MJC:pac:ljc 95448 \Pleadings\95448 46 Pretrial Memo 10-14-22

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CHARM HOWIE | : | |
| | : | |
| VS. | : | C.A. NO. 1:17-cv-00604-JJM-LDA |
| | : | |
| CITY OF PROVIDENCE, by and through its | : | |
| Treasurer, JAMES J. LOMBARDI III, ET AL | : | |

### DEFENDANTS' PRETRIAL MEMORANDUM

DEFENDANTS,
PLACE, POTTER AND SHERIDAN,
By their Attorney,


/s/ Michael J. Colucci, Esq.
Michael J. Colucci, Esq. #3302
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI  02886
PHONE:  (401) 737-3700
FAX:  (401) 737-5499


DEFENDANT, CITY OF PROVIDENCE,
By its Attorneys,


/s/ Jillian H. Barker, Esq.
/s/ Steven B. Nelson, Esq.
Jillian H. Barker, Esq. #8353
Steven B. Nelson, Esq. #8142
PROVIDENCE LAW DEPARTMENT
444 Westminster Street, Suite 220
Providence, RI  02903
PHONE:  (401) 680-5333
FAX:  (401) 680-5520

# TABLE OF CONTENTS

I.     BRIEF STATEMENT OF FACTS ................................................................. 1

II.    GOVERNING LAW ..................................................................................... 3

    A.    Unreasonable Seizure/False Arrest:  Federal and State Constitutional
         and State Law Claims (Counts One, Two and Eight) ............................ 4

    B.    False Arrest:  State Law Claim ......................................................... 5

    C.    State Constitutional Claims ............................................................... 6

    D.    Unreasonable Seizure/Excessive Force:  Federal and State Constitutional
         and State Law Claims (Counts Three, Four, Six and Seven) ................ 9

    E.    Malicious Prosecution/Federal and State Law Claims (Counts Five and Six) ......... 11

    F.    Malicious Prosecution (State Law Claims) ........................................ 14

    G.    Municipal Liability ......................................................................... 15

         1.    Failure to Discipline ............................................................... 17

         2.    A Municipality Cannot be Held Liable Pursuant to § 1983 under a
             Theory of Respondeat Superior ............................................... 18

         3.    Malicious Prosecution Pursuant to § 1983 .............................. 19

         4.    State Law Claims of False Arrest, Excessive Force, and
             Malicious Prosecution ......................................................... 20

    H.    Qualified Immunity ......................................................................... 22

III.   EVIDENTIARY ISSUES LIKELY TO ARISE ....................................... 24

IV.   PROBABLE LENGTH OF TRIAL .......................................................... 25

V.    WITNESSES AND EXHIBITS .............................................................. 26

VI.   PROPOSED JURY INSTRUCTIONS AND VERDICT FORM .................... 30

I.    **<u>BRIEF STATEMENT OF FACTS</u>**

     The plaintiff is Charm Howie.

     The defendants are the City of Providence and three of its police officers, Michael Place, Patrick Potter and Matthew Sheridan.

     This action arises out of the arrest of the plaintiff on July 21, 2015 at approximately 1:40 A.M. at or about 44 Adelaide Avenue in Providence, Rhode Island.  Officers Place and Sheridan, relatively new officers for the City, were working the third shift and had just completed a traffic stop on Broad Street.  Their patrol cars were parked on opposite sides of the street with Officer Place's vehicle facing north and Officer Sheridan's vehicle facing south.  Other police vehicles which had been present at the traffic stop had cleared the scene, and Sheridan was standing outside of the vehicle in which Officer Place was sitting.  They were conversing when they noticed a vehicle approaching them at a relatively elevated speed with one of its headlights out.  That vehicle was traveling southbound on Broad Street and was being operated by the plaintiff.  The officers decided to effectuate a traffic stop.  Sheridan entered his vehicle and began traveling southbound.  Place turned his vehicle around and followed behind Sheridan.

     For his part, the plaintiff acknowledges that he had a problem with the headlight.  Although he denied that he knew it was out that evening, he acknowledged a prior problem with it.  His ex-wife, Lillian Willie, testified that it had dislodged on a prior occasion and she attempted some temporary repairs with duct tape, but on the day of the incident there was just an empty hole in place of the headlight.

     Both officers continued south down on Broad Street in an effort to catch up with and stop the plaintiff's vehicle.  They observed the vehicle turn right onto Adelaide Avenue without signaling and at that point, both officers also turned onto Adelaide, illuminated their overhead lights and sirens, and observed the vehicle as it continued westbound on Adelaide.

     Sergeant (now lieutenant) Potter was approximately one block down on Adelaide Avenue, in the completion phase of a traffic stop.  He noticed the plaintiff's vehicle travel by him followed by the two police vehicles.

     According to the plaintiff, he thought that the following officers were simply making their way towards Sergeant Potter's traffic stop.  As such, he did not stop but continued on to his apartment located further down the road at 44 Adelaide.  Sheridan and Place continued to follow the plaintiff's

vehicle past Sergeant Potter and observed the plaintiff turn abruptly into 44 Adelaide.  They did not know who was operating the vehicle or what that person's relationship was, if any, to that location. Sheridan parked his police car at the end of the driveway where it met the road, got out of his vehicle and proceeded to walk up the driveway.  Officer Place parked his vehicle to the right of Sheridan's vehicle and, likewise, Place got out and followed up the driveway.

As both officers were making their way toward the plaintiff's vehicle, the plaintiff alighted therefrom, and began to approach them in an aggressive and loud manner, accusing them of harassing him.  At that point, the officers recognized Howie, as he had been a member of their Police Academy for approximately six weeks before being dismissed the previous June (2014).  Howie was holding a piece of pizza in his hand and continued to approach the officers while yelling at them.  He was ordered by Officer Place to get back in his vehicle, but he refused to do so.  He was then ordered to place his hands on his vehicle which he likewise refused.  As they continued to argue about it, Howie then complied and Officer Sheridan began a quick pat down of the plaintiff.  However, the plaintiff continued to push off the vehicle and attempt to turn around while expressing his displeasure with the process.  It was at or about that time that Sergeant Potter arrived and approached as Sheridan completed the pat down.

The plaintiff was also screaming in Spanish for assistance from anyone living nearby.  The plaintiff acknowledges doing this and he was asked to sit in the police car, unhandcuffed, in an effort to deescalate the situation and have him calm down.  He initially sat in the police car but refused to put his legs in.  Officer Sheridan had to bend down and put his feet in the vehicle, and as the officers attempted to close the door, the plaintiff pushed it back in their direction barely missing Sheridan and grazing Sergeant Potter.  The plaintiff acknowledges that the door bounced back, but claims that it was just a natural reaction to his blocking the door from closing on his legs.

As the plaintiff initially sat inside the vehicle, he pounded the interior in anger.  It was decided he would be placed under arrest for his disorderly behavior.  The door was opened and Sheridan reached in to place handcuffs on Mr. Howie.  However, the plaintiff retracted back from Sheridan and placed his hands up in a defensive-type position.  Sheridan attempted to hold the plaintiff in place against the center partition of the rear seat.  The plaintiff claims Sheridan attempted to choke him at this point.

-2-

Sergeant Potter, in a further attempt to deescalate the situation, had Sheridan retreat back out of the vehicle so that the door could be closed to give the plaintiff an additional opportunity to calm down.  Potter discussed with the plaintiff that he was going to be arrested, and the plaintiff did relent and allowed himself to be handcuffed without incident.

All acknowledge that this was the first time these parties had seen each other since the plaintiff left the Academy and other than perhaps occasions related to this litigation, it was the last time they saw each other.  The plaintiff was under the belief that the officers recognized him on Broad Street and then pursued him because he felt they did not like him at the Academy.

The plaintiff was transported to the police station, processed and released to appear on a municipal charge of disorderly conduct.  When that matter came up in the municipal court, the plaintiff refused any attempt to resolve the same.  The case was dismissed in the municipal court.  The prosecutor refiled the same in the state district court and charged the plaintiff with disorderly conduct under the state statute, as well as simple assault (for the actions of the door being pushed into the officers) and resisting arrest.  That matter was ultimately tried in late 2016 before Judge Madeline Quirk.  The plaintiff was found not guilty.

II.    **GOVERNING LAW**

The plaintiff has filed a nine-count complaint broken down as follows:

Count One - False Arrest—§ 1983;

Count Two - False Arrest—Rhode Island Constitution;

Count Three - Excessive Force—§ 1983;

Count Four - Excessive Force—Rhode Island Constitution;

Count Five - Malicious Prosecution—§ 1983;

Count Six - Common Law Assault;

Count Seven - Common Law Battery;

Count Eight - Common Law False Arrest; and

Count Nine - Common Law Malicious Prosecution.

A.      Unreasonable Seizure/False Arrest:  Federal and State Constitutional and
        State Law Claims (Counts One, Two and Eight)

It goes without saying that where an arrest is supported by probable cause, there can be no

redress under federal or state law.  A warrantless arrest is reasonable if the officer has probable cause

to believe that the suspect committed a crime in the officer's presence, *District of Columbia v. Wesby*,

138 S.Ct. 577, 586 (2018) [9], R.I.G.L. § 12-7-3.[1]  Moreover, where there is probable cause to

arrest an individual, it does not matter one way or the other whether that person actually committed

the crime or was ultimately found innocent thereof, *Moody v. McElroy,* 513 A.2d 5 (R.I. 1986),

*Wesby*, 138 S.Ct. at 586 [9-10].  Likewise, where an arrest is valid under the federal constitution, it

remains a valid arrest even if the state had more restrictive protections in place, *Virginia v. Moore*,

128 S.Ct. 1598 (2008).

To determine whether probable cause existed, the court examines the events leading up to the

arrest and then decides whether these historical facts, viewed from the standpoint of an objectively

reasonable police officer, amount to probable cause, *Wesby* at 586 [9].  Because probable cause deals

with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not

readily or even usefully reduced to a neat set of legal rules, *Id*.  It requires only a probability or a

substantial chance of criminal activity, not an actual showing of such activity, *Id*. [9-10].  *See also,*

*Cioci v. Santos*, 99 R.I. 308 (1965).  Where the presence of probable cause is at least arguable, then

the officer's conduct is to be considered objectively reasonable and hence, not an unreasonable

seizure, *Briggs v. Malley*, 748 Fed.2d 715 (1st Cir. 1984).

Moreover, as the U.S. Supreme Court reminded us of in *Wesby*, factors which make up

probable cause cannot be looked at in isolation.  In *Wesby*, a number of persons had occupied a vacant

building in order to engage in various "party" activities.  The lower court had discussed the various

factors that the officers had wanted them to consider (on the issue of probable cause), and in looking

at those factors in isolation, one by one, the lower court felt the various factors, standing alone, were

not sufficient to create probable cause, 138 S.Ct. at 588 [11].  In doing this, the Supreme Court stated

that the lower court failed to follow two basic and well established principles of law.  First, it viewed

_____

[1] Page numbers contained in [ ] are in reference to the page numbers of the printed cases
supplied with this memorandum.

each fact in isolation rather than as a factor in the totality of the probable cause circumstances, and that the totality of the circumstances requires courts to consider "the whole picture," *Id*. [11].

Second, the lower court mistakenly believed that it could dismiss outright any circumstances that were "susceptible of innocent explanation," *Id*.  However, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts.  As we have explained, the relevant inquiry is not whether particular conduct is innocent or guilty
but the degree of suspicion that attaches to the particular types of non-criminal acts," *Id*.

### B.     False Arrest:  State Law Claim

For a state law claim of false arrest, a plaintiff must show (1) that the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) lack of consent to the confinement, (4) the confinement was not otherwise privileged, and (5) the plaintiff was detained without legal justification, *Dyson v. City of Pawtucket*, 670 A.2d 233, 239 (R.I. 1996).

Under Rhode Island statutory law, a police officer has a lawful right, in fact, a lawful duty to arrest any individual, even without a warrant, if that officer has probable cause to believe that a crime has been committed in his presence, R.I.G.L. § 12-7-3.  Additionally, where there is probable cause to arrest an individual, it does not matter one way or the other whether that person actually committed the crime or was ultimately found innocent of the same, *Moody v. McElroy*, 513 A.2d 5 (R.I. 1986).  Moreover, state law forbids the resistance of an officer's attempts to arrest even where the individual believes, or it is ultimately shown that the arrest was an illegal one, R.I.G.L. § 12-7-10.  State law also allows for the temporary detention of suspects whenever a police officer has reason to suspect that a person is committing, has committed, or is about to commit a crime.  Such persons may be held for a period of up to two (2) hours without being charged, R.I.G.L. § 12-7-1.

It is also important to note that under Rhode Island and federal law, if a lawful cause of arrest exists, the arrest shall be considered lawful even though the officer made the arrest on an improper ground, R.I.G.L. § 12-7-5.

In *Devenpeck v. Alford*, 125 Sup. Ct. 588, 589, it was held that a warrantless arrest by a police officer is reasonable under the Fourth Amendment where there is probable cause to believe that a crime has been or is being committed.  There is no requirement that the offense establishing probable cause must be "closely related" to, and based on, the same conduct as the offense the arresting officer

identifies at the time of the arrest, and such a requirement would be inconsistent with the Supreme Court's precedent which holds that an arresting officer's state of mind (except for facts that he knows) is irrelevant to probable cause, *Id.*

### C.   State Constitutional Claims

Count 2 asserts claims under the Rhode Island State Constitution.

The R.I. Constitution, Article I, Section 6 prohibits unreasonable searches and seizures.  The language of such state constitutional provisions were intended to mirror the language of the U.S. Constitution, *see Eastridge v. Rhode Island College*, 996 F.Supp. 161, 169 [10] (D.R.I. 1998). Although the intent of Article I, Section 6 is rather obvious from the language itself, it is significant for other reasons.  Persons are expressly authorized to bring private causes of action against state or municipal officials who violate their rights under the federal Constitution, via 42 U.S.C. § 1983. There is no similar enabling statute which the Rhode Island Legislature has passed to create a private cause of action under the state Constitution.  The Rhode Island Supreme Court follows what appears to be the general rule in that a cause of action will not be implied or created where a remedy already exists to address the harm alleged, *see Folan v. State D.C.Y.F.*, 723 A.2d 287, 292 [7] (R.I. 1999).

In *Folan*, the plaintiff alleged sexual harassment by a supervisor at the state agency in question.  She brought a cause of action against her employer under the Fair Employment Practices Act ("FEPA") and the Civil Rights Act ("CRA") as well as under Article I, Section 2 of the Rhode Island Constitution, *Id.* at 289 [4].  The Rhode Island Supreme Court held, among other things, that since the FEPA and the CRA provided comprehensive remedies for employee discrimination, it would not be necessary to create or recognize a direct remedy pursuant to Article I, Section 2 of the state Constitution, *Id.* at 292 [7].  "Such a remedy should be reserved for situations where no statutory remedy is provided," *Id.*

Likewise, in the case at bar, 42 U.S.C. § 1983 has long been in existence to provide an express remedy for the very same violations alleged under the state Constitution in the plaintiff's complaint.  As such, there is no basis to create or imply a private cause of action under the state Constitution for alleged violations of these rights, *see also Eastridge*, supra (under Rhode Island law . . . there is no implied right of action to redress employment discrimination under the state constitutional provision paralleling language of the Fourteenth Amendment, when the claimant has

alternate means of pursuing relief); *Vingi v. State*, 991 F.Supp. 44 (D.R.I. 1997), affirmed 132 F.3d 31, cert. denied 118 S.Ct. 2373 (unsuccessful female applicant to the State Police academy could not maintain a constitutional cause of action under the state's equal protection clause, given the availability of alternative remedies to provide her with relief under Title VII and the Rhode Island FEPA); *Taylor v. State*, 726 F.Supp. 895 (D.R.I. 1989) (female employee who was denied promotion allegedly based on her sex could not maintain a constitutional cause of action under the due process and equal protection provisions of the Rhode Island Constitution given the availability of alternative remedies to redress such grievances under Title VII and the Rhode Island Fair Employment Practices Act).

To be sure, the Rhode Island Supreme Court, in constructing and comparing the constitutional provisions chiefly at play here, has noted the parallels between its federal counterparts, *see State v. Germane*, 971 A.2d 555 (R.I. 2009) (noting the parallel provisions of Article I, Section 2 and the due process clause of the federal Constitution); *Kleczek v. Rhode Island Interscholastic League, Inc.*, 612 A.2d 734 (R.I. 1992) (equal protection clause Article I, Section 2 contains protection similar to the equal protection guarantee of the Fourteenth Amendment of the U.S. Constitution). *See also, Wyrostek v. Nash*, 984 F.Supp.2d 22 (D.R.I. 2013) (due process analysis under both the U.S. and Rhode Island Constitutions is identical).

Likewise, with regard to Article I, Section 6 of the Rhode Island Constitution, the state Supreme Court long ago stated that "it is not denied that Article I, Section 6 of our Constitution has been construed as having the same effect as the Fourth Amendment to the Constitution of the United States," *State v. Davis*, 251 A.2d 394, 397 [4] (R.I. 1969); *State v. Timms*, 505 A.2d 1132, 1137(fn.7) [7] (R.I. 1986) (Article I, Section 6 of the Rhode Island Constitution thus protects the individual's rights . . . in the same way as does the Fourth Amendment . . .).

Accordingly, since the State of Rhode Island has no enabling statute to allow a private cause of action under the state Constitution (whereas 42 U.S.C. § 1983 expressly provides for the same under the federal Constitution), to allow these counts to go forward would require that such a right be implied or created outside of the legislative process.  Even if an available remedy such as is provided for under § 1983 did not exist, private causes of action for damages are generally not available under the Rhode Island Constitution where the constitutional provisions at issue express only general principles without a specific rule, expressly stated or otherwise "self-executing" that provides that

such rights may be enjoyed, protected or enforced, no private cause of action exists for redress, *see Bandoni v. State*, 715 A.2d 580, 587 (R.I. 1998).

In *Bandoni*, Mr. and Mrs. Bandoni were knocked off their motorcycle by a drunk driver. Despite being promised by the local prosecuting authorities that they would be kept apprised of the underlying criminal proceedings, they were not and the drunk driver was able to plead to reduced charges, etc.  The Bandonis were not aware of it and allege that they lost their opportunity to address the court as the victims, as well as an opportunity to seek restitution for their injuries in conjunction with those proceedings, *Id.* at 582-583.  They brought suit against the local and state authorities alleging common law negligence, as well as a cause of action under Article I, Section 23 of the Rhode Island Constitution, *Id.*

The Rhode Island Supreme Court discussed the history of the 1986 Amendments to the State Constitution and the provision at issue entitled "Rights of Victims of Crime," *Id.* at 585.  That provision was written to ensure that victims of crime are entitled to receive financial compensation from the perpetrator and are to be given an opportunity to make a victim's impact statement before the court, *Id.*  The Court noted that it was significant that the Rhode Island Constitution, like many other states, does not provide a cause of action for damages in the event that officials who are charged with informing crime victims of their rights fail to comply, *Id.*  The Bandonis argued that the cause of action should be implied and/or created similar to a *Bivens* claim.  The Court noted that the threshold question was whether or not the constitutional provision at issue is self-executing; in other words, does the provision supply "a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed be enforced . . . or does it merely indicate principles, without laying down rules by means of which those principles may be given the force of law," *Id.* at 586.

The Court further noted that such a determination was largely governed by the U.S. Supreme Court decision of *Davis v. Burke*, 21 S.Ct. 210, 212 (1900) such that:

> A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.  In short, if complete in itself, it executes itself.

Referencing further developments of that standard, the Rhode Island Supreme Court noted guidelines from the Vermont Supreme Court, to wit:

> First, a self-executing division should do more than express only general principles; it may describe the rights in detail, *including the means for its enjoyment and protection* . . . Ordinarily a self-executing provision does not contain a directive to the legislature for further action . . . The legislative history may be particularly informative as to the provisions' intended operation . . . Finally a decision for or against self-execution must harmonize with the scheme of rights established in the Constitution as a whole.

Citing *Shields v. Gerhart*, 658 A.2d 924, 928 (Vermont 1995).

Utilizing that standard, the *Bandoni* Court was of the opinion that since Article I, Section 23 expresses only general principles and does not supply a sufficient rule of law by which those general rights may be enjoyed, protected, or enforced, "we must conclude that this provision is not self-executing," *Id.* at 587. The Court also noted that the constitutional provision did not expressly provide a cause of action for damages. While that alone may not be the end all of the question, it is an additional indication that the constitutional provision at issue did not provide a sufficient rule by which the rights given may be enjoyed or protected, *Id.* at 589.

### D.    Unreasonable Seizure/Excessive Force:  Federal and State Constitutional and State Law Claims (Counts Three, Four, Six and Seven)

When recovery is sought under § 1983 in brutality actions against police officers, it is the protections of the Fourth Amendment which are involved. This principle was made clear by the U.S. Supreme Court in *Graham v. Connor*, 109 S.Ct. 1865 (1989). The *Graham* court summarized the law in this area and held that for such claims, we look to the protections of the Fourth Amendment which guarantees citizens the right to be secure to their persons against unreasonable seizures, *Id.* In determining whether or not the force used is reasonable under the Fourth Amendment, a balancing of the interest of the individual to be free from unreasonable seizures versus the interest of the government to place persons suspected of criminal activity under arrest, must be made, *Id.* The test used is known as the test of objective reasonableness. That test requires that one look at the facts and circumstances confronting the police officer without regard to the officer's underlying intent or motivation, *Id.* In other words, the subjective intent or state of mind of the police officer is

immaterial.  Under the objective reasonableness test, one looks to the facts and circumstances of the particular case at issue, including the severity of the crime at issue, whether the suspect poses as an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight, *Id. citing Tennessee v. Garner*, 471 U.S. at 8-9.

The Supreme Court in *Graham* further noted that the reasonableness of a particular use of force <u>must</u> be judged from the perspective of a police officer on the scene and not with the 20/20 vision of hindsight.  In other words, it is the reasonableness of the police officer's conduct at the moment of arrest that is important because not every push or shove, even if it later appears to be unnecessary in the peacefulness of a courtroom, necessarily violated the Fourth Amendment, *Id. citing Johnson v. Glick*, 481 F.2d at 1033.  Accordingly, in analyzing the officer's conduct, the *Graham* court indicated that there <u>must</u> be an allowance for the fact that police officers are often forced to make split second decisions in circumstances that are often tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation, *Id*.  Moreover, the correct focus ***must be*** on the significance that the officer attaches to the perceived threatening action in circumstances which he could not know, with assurance, the suspect's exact state of mind or intent, *Hegarty v. Somerset County*, 53 F.3d 1367, 1379 at F.N. 11 (1st Cir. 1995).

It must be further noted that despite the "reasonableness" language of the objective reasonableness test, the same should not confuse the fact that intentional conduct is required before liability can be found.  It is well settled that negligence on the part of an individual, even if the individual is a state official, is insufficient to trigger liability under § 1983, *Baker v. McCollan*, 433, U.S. 137, 140 (1979).  See also *Daniels v. Williams*, 106 S.Ct. 662, 663 (1986).

As to the excessive force claim under the Rhode Island State Constitution, your defendants incorporate the same arguments above regarding state constitutional claims.  Those arguments would equally apply here because of the existence of § 1983.

With regard to the state law claims of assault and battery, there are no extraordinary issues of law involving these claims.  In light of the plaintiff's count for excessive force under the Fourth Amendment, it is suggested that this count will be subsumed thereby and, as such, is unnecessary as a separate cause of action.

### E.      Malicious Prosecution/Federal and State Law Claims (Counts Five and Six)

In *Hernandez-Cuevas v. Taylor*, 723 F.3d 91 (1st Cir. 2013), the Court recognized a Fourth Amendment "malicious prosecution" claim for the first time in this Circuit.  However, nothing in that decision changes the landscape such that a plaintiff must still show the absence of probable cause or that the stated probable cause was based on fabricated or deliberately false or perjured evidence, 723 F.3d 91, 100-102 [8-9].  In this case, a pretrial detainee sued police officers, alleging that their unlawful conduct caused him to be held in custody for three months without probable cause.

The case involved a joint task force operation investigating drug trafficking.  The suspect, described as a black male, 5' 7" tall, 150 lbs., was seen engaging in an apparent drug transaction. They followed him to an apartment complex area but lost him.  Over two years went by and under pressure to get results, the allegations were that the officers involved created a false report identifying the plaintiff, who happened to live in that same apartment complex, as the suspect.

This case required the First Circuit Court to decide for the first time whether an individual who alleges that the unlawful conduct of law enforcement officers which caused him to be held for three months in pretrial detention without probable cause, states a Fourth Amendment claim, often called a Fourth Amendment malicious prosecution claim, *Id*. at 94 [4].  The court concluded that an individual's Fourth Amendment right to be free from seizure but upon probable cause continues through the pretrial period, and that, in certain circumstances, injured parties can vindicate that right through § 1983, *Id*.

In exploring its rationale, the court opined that neither this circuit nor the Supreme Court had ever explicitly determined that the Fourth Amendment encompasses a malicious prosecution claim, *Id*. at 97 [7], but there had long been a sense among the courts that the Constitution provides some protection for individuals who are targeted for unreasonable, baseless prosecution and who, as a result, are detained without probable cause during the pretrial period, *Id*. at 98 [7].

In 1994, the U.S. Supreme Court decided *Albright v. Oliver*, 114 S.Ct. 807, which firmly closed the door on substantive due process as a vehicle for bringing such claims.  In addition, at least a plurality of the judges concluded that procedural due process would likewise rarely, if ever, be an appropriate vehicle for such claims, *Id*.  At the same time, however, the court strongly suggested in dicta that the plaintiff in *Albright* would have been more successful if he had sought relief under the Fourth Amendment, *Id*. at 99 [7].

-11-

As a result of this dicta, a "sea change" in the law developed, and where previously only a minority of the circuits recognized a Fourth Amendment malicious prosecution claim, it then became the majority rule, *Id.*  Although it became the majority rule, there was division in the circuits over the elements of such a claim.  The claims fell in two groups.  One is a pure constitutional approach requiring the plaintiff to demonstrate only a Fourth Amendment violation.  The second approach adopted a blended constitutional/common law approach requiring the plaintiff to demonstrate a Fourth Amendment violation and all the elements of a common law malicious prosecution claim, *Id.* at 99 [8].

The only difference is what elements need to be proved.  Under the purely constitutional approach, the plaintiff does not have to show that an officer acted with malice, because the subjective state of mind under the objective reasonableness test is not relevant.  The plaintiff need only show the conduct was objectively unreasonable.   Under the blended approach, the plaintiff must also show common law malice, *Id.* at 99 [8].

The *Hernandez-Cuevas* court adopted the majority rule in concluding that the Fourth Amendment protection against seizure but upon probable cause does not end when an arrestee becomes held pursuant to legal process, *Id.* at 100 [8].  Although the Fifth and Sixth Amendments generally control events following the arrest and arraignment of an individual accused of committing a crime, "we are convinced that an individual does not lose his Fourth Amendment right to be free from unreasonable seizure when he becomes detained pursuant to judicial process," *Id.*

Having said that, however, a reading of the entire case readily reveals that other than for allowing a plaintiff to proceed under § 1983, the governing and longstanding principles enunciated above as to probable cause, still rule the day.  As the court stated, "Certainly, in most cases, the neutral magistrate's determination that probable cause exists for the individual's arrest is an intervening act that could disrupt any argument that the defendant officer had caused the continued unlawful seizure," *Id.*  If a plaintiff can overcome this causation problem and demonstrate that law enforcement officers were responsible for his continued unreasonable pretrial detention, the plaintiff has stated a constitutional injury that may be vindicated through § 1983, *Id.*  For example, officers could be liable when they lied or misled prosecutors, or failed to disclose exculpatory evidence, or unduly pressured a prosecutor to seek an indictment, *Id.*

> If any concept is fundamental to the American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit, *Id.*  We now further specify that one constitutional source of this self-evident prohibition against manufactured evidence in the pretrial detention context is the Fourth Amendment's guarantee of freedom from seizure but upon
> probable cause, *Id.*

As to the elements of such a claim, this circuit adopted a purely constitutional approach, holding that a plaintiff may bring a suit under § 1983 if he can establish that the defendant caused a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and criminal proceedings terminated in the plaintiff's favor, *Id.* at 101 [9].  Although adopting a purely constitutional rather than a blended constitutional/common law approach, the court cautioned that it believed that the practical consequences of this choice were less significant than they initially appeared, *Id.*

The *Hernandez-Cuevas* court looked to the reasoning of *Franks v. Delaware*.  To establish a Fourth Amendment violation involving pretrial detention under the Supreme Court's reasoning in *Franks*, a plaintiff must demonstrate that despite the magistrate's determination that the evidence presented was, on its face, sufficient to establish probable cause, that evidence was in fact constitutionally unacceptable because the officers formulated evidence essential to the probable cause determination with a mental state similar to common law malice, *Id.*  The *Franks* court thus concluded that in order for a warrant to satisfy the Fourth Amendment, the magistrate's probable cause determination must not have relied upon evidence an officer submitted in bad faith, *Id*. at 101 [9].

Key, however, is the decision's acknowledgment that *Franks* did not establish strict liability for police officers.  To show that the evidence presented to the magistrate was not truthful in the *Franks* sense, allegations of police negligence or innocent mistake are insufficient, *Id*. at 102 [9].  Rather, the plaintiff must demonstrate that law enforcement officers made statements in the warrant affidavit which amounted to deliberate falsehoods or in reckless disregard for the truth, and that those deliberate falsehoods were necessary to the magistrate's probable cause determination, *Id*.

Accordingly, although a plaintiff may now bring a cause of action under § 1983 for a "malicious prosecution" claim, the substantive analysis of such a claim remains governed by the above-stated and well-established rules regarding probable cause.

**F.    Malicious Prosecution (State Law Claims)**

Count Nine of the plaintiff's complaint alleges a state law claim for malicious prosecution.  To establish a malicious prosecution claim under Rhode Island law, a plaintiff must prove "(1) the initiation of a criminal proceeding against her; (2) the termination of that previous proceeding in her favor; (3) a lack of probable cause to initiate the criminal proceeding; and (4) the existence of malice on [defendant's] part," *Vigeant v. U.S.*, 462 F.Supp.2d 221, 227 (D.R.I. 2006).

Malicious prosecution cases are disfavored under Rhode Island law because they are viewed as discouraging the prosecution of criminal acts, *Id.*  To mitigate the chilling effect of malicious prosecution cases on law enforcement, Rhode Island law requires that the elements of malice and lack of probable cause be established by "clear proof," *Id. citing Solitro v. Moffat*, 523 A.2d 858, 862 (R.I. 1987).  The probable cause inquiry must focus on the presence of probable cause at the time criminal charges were filed, *Vigeant*, 462 F.Supp.2d at 228.

Under Rhode Island law, the presence of probable cause alone will defeat a plaintiff's claim for malicious prosecution even if he can establish the remaining three elements of the tort, *Vigeant*, 462 F.Supp.2d at 230; *citing Brough v. Foley*, 572 A.2d 63, 66 (R.I. 1990) ("[p]roof of malice alone, however, even in the extreme, will not suffice to establish a case of malicious prosecution").  *See also Henshaw v. Doherty*, 881 A.2d 909, 915 (R.I. 2005) (disposing of a malicious prosecution case based solely on the presence of probable cause).

Moreover, the issue of who the proper party is for the "initiation" of a prosecution is paramount.  A defendant cannot be found liable for malicious prosecution where he did not prosecute the plaintiff and, at best, he merely reported a charge in his police report.  In reviewing Rhode Island law, this circuit has ruled that the law of initiation in Rhode Island is not clear when it comes to an arresting police officer, *see Senra v. Cunningham*, 9 F.3d 168, 174 (1st Cir. 1993)[7].  To obtain some guidance, the First Circuit looked to Rhode Island law concerning liability for private persons bringing information to the police and ruled that the chain of causation is broken if the filing of the charge by the prosecutor was free of pressure or influence exerted by the police officer, or knowing misstatements made by the officer to the prosecutor's office, *Id.*  For example, if it could be shown that the police officer lied about the events in question and communicated that false information to

-14-

prosecutors, it would follow that the evidence upon which prosecutors based the charge was false, and hence, the prosecutors could not have exercised their discretion, *Id.* Moreover, malicious prosecution, amongst other things, requires *clear proof* of malice, and mere negligence does not suffice to satisfy the malice element.

### G.    Municipal Liability

42 U.S.C. § 1983 allows a municipality to be found liable to a plaintiff for the violation of his or her constitutional rights, when—and only when—(1) the deprivation of plaintiff's constitutional rights occurred *because of* a municipal policy or custom, (2) that was created or approved by an official policy maker of the municipality that (3) acted with deliberate indifference.  42 U.S.C. § 1983; *See Saldivar v. Racine,* 818 F.3d 14, 20 (1st Cir. 2016).

Counts One (False Arrest), Three (Excessive Force), and Five (Malicious Prosecution) each seek to hold the City liable to the Plaintiff under 42 U.S.C. § 1983.

In order for a municipality to be found liable under § 1983, the plaintiff must first prove that he or she suffered a constitutional deprivation ***and*** that said constitutional deprivation was caused by a municipal policy.  *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978), *see also*, *Manner Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637-638 (11th Cir. 1991).  The threshold element, however, is a constitutional deprivation at the hands of an officer.

> *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.  If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

*City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L. Ed. 2d 806 (1986).

An unconstitutional policy or custom can be established by an unconstitutional written policy.  Alternatively, plaintiff can prove that the constitutional deprivation occurred pursuant to a widespread practice or custom that—although not authorized by written law or express municipal policy—is so permanent and well-settled that it constitutes a custom or usage with the force of law.  *See City of St. Louis v. Praprotnick*, 485 U.S. 112 (1988).  Furthermore, if there has been no constitutional violation, there cannot be any municipal liability.

The plaintiff must prove that an unconstitutional policy *caused* the constitutional deprivation that the plaintiff alleges.  In other words, the plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.  *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020), *cert. denied sub nom. Polk Cnty., Wisconsin v. J.K.J.*, 208 L. Ed. 2d 563, 141 S.Ct. 1125 (2021); *see also Monell*, 436 U.S. at 694, 98 S.Ct. 2018 (explaining that only when a municipality's policy or custom "inflicts the injury" is the entity responsible under § 1983).

Not only must a plaintiff show that a municipal policy or custom led to the constitutional deprivation alleged, but plaintiff must also prove that the alleged unconstitutional policy or custom was *officially sanctioned or ordered by municipal officials who have "final policy making authority*." *Id.*  "[O]nly those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability.  Whether a particular official has "final policymaking authority" is a question of state law."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L. Ed. 2d 107 (1988) *citing Id.* at 483, 106 S.Ct., at 1300 (plurality opinion).

Finally, the plaintiff must show that the official policy maker acted with "deliberate indifference." *Saldivar v. Racine*, 818 F.3d 14, 20 (1st Cir. 2016) *citing Connick,* 563 U.S. at 61 ("A City is liable under *Monell* for the acts of a final policymaker only if those acts constitute deliberate indifference.") *Young v. City of Providence,* 404 F.3d 4, 26 (1st Cir. 2005); *see also Hagopian v. City of Newport,* C.A. No. 18-283 WES, 2021 WL 4742701, at *4  *citing City of Canton Ohio v. Harris,* 489 U.S 378, 388 (1989) ("Where, as here, the plaintiff's claims are predicated on a custom or policy of municipal inaction . . . courts must ascertain whether the failure "amounts to deliberate indifference to the rights of the persons with whom the police come into contact.")

For municipal inaction—as the plaintiff in the instant matter alleges—to amount to deliberate indifference, plaintiff must show:  (1) that the officials had knowledge of facts, from which (2) the official[s] can draw the inference (3) that a substantial risk of serious harm exists.  *Parker v. Landry,* 935 F.3d 9, 15 (1st Cir. 2019) (*quoting Guadalupe-Báez*, 819 F.3d at 515).  Said another way, the policy must be so pervasive as to allow an "inference of supervisory encouragement, condonation or even acquiescence."  *Id. citing Santiago v. Fenton*, 891 F.2d 373, 382.  Plaintiff must prove that a municipal custom or practice is so "well settled and widespread that the policy making officials of the municipality can be said to have either actual or constructive notice of it yet did nothing to end the

practice." *Hagopian*, 2021 WL 4742701, at *4; *citing Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1ˢᵗ Cir. 1898).

"Both establishing the existence of a municipal custom and showing that the custom amounted to deliberate indifference to the rights of the police populace require **facts establishing that city officials were on notice of their need to end the unconstitutional practice**." *Id.* at 5, *citing Parker v. Landry,* 935 F.3d 4, 15 (emphasis added); *Bordanaro v.McLeod,* 871 F.3d 1151, 1156. In order to meet his burden here, Plaintiff must demonstrate specific facts and instances of claims of the same constitutional torts he alleges in the instant matter, and that the municipality was aware of those prior specific instances but failed to remedy the situation. *Saldivar,* 818 F.3d at 18-19; *Eason v. Alexis*, 824 F.Supp.2d 236, 246 (D. Mass. 2011) *quoting Young,* 404 F.3d at 25-28.

### 1.   Failure to Discipline

Despite the cursory allegations referenced in the body of plaintiff's complaint, his complaint does not clearly make out a failure to discipline claim, or a claim for having a custom or policy of failing to discipline that was deliberately indifferent to his constitutional rights. *See* E.C.F. No. 1, at p. 9, ¶ 65; p. 10, ¶ 71. Nor does plaintiff's complaint make any link to his actual counts against the various defendants and a theory of failure to discipline or any other theory of municipal liability. Nonetheless, the defendants anticipate that plaintiff will attempt to make a case against the City for failure to discipline at trial. The defendants have filed a motion in limine on this issue, but assuming for purposes of this memorandum that the motion in limine is denied, the City provides these guidelines on the topic.

Liability under a failure to discipline theory is evaluated under the deliberate indifference standard. *DiRico v. City of Quincy*, 404 F.3d 464, 469 (1st Cir. 2005) (analyzing failure to discipline, train and supervise under the deliberative indifference standard). "In order to establish liability under a failure to discipline theory, the plaintiff must show a persistent failure to discipline that demonstrates the existence of a custom or policy . . . " *Barker v. City of Boston*, 795 F.Supp. 2d 117, 124 (D. Mass. 2011). Moreover, "this failure must be so extreme and pervasive that it amounts to a deliberate indifference to the rights of persons with whom the officers come into contact." *Chapman v. Finnegan*, 950 F.Supp.2d 285, 293 (D. Mass. 2013).

To make out a claim on a failure to discipline theory of municipal liability, a plaintiff must put forth "a series of *similar prior constitutional violations* which were ignored long after city officials

and supervisors were on notice of their need to act." *Hagopian*, 2021 WL 4742701, at \*4 (*quoting Gonsalves v. Clements*, No. CV 21-021 WES, 2021 WL 3471335, at \*2 (D.R.I. August 6, 2021) ("Generally, [deliberate indifference] requires a pattern of prior similar constitutional violations") (emphasis added).  To that end, in order to properly put the city on notice on a failure to discipline theory, plaintiff would further need to demonstrate that the officers in this case had (1) known allegations of misconduct that (2) pre-dated this incident, (3) were of a similar kind as is alleged in this case that were (4) shown by the plaintiff to be unconstitutional acts that were (5) not disciplined by the police department. *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 93-94 (1st Cir. 1994); *See also*, *Saldivar* 818 F.3d at 17-19.

Here, to establish a failure to discipline claim, the plaintiff would have to prove that the City systematically failed to discipline it's officers, including the named defendant officers.[2]  In fact, this is even more so because the defendant patrol officers, Sheridan and Place, had received no prior civilian complaints at all, let alone any relating to excessive force, false imprisonment, or malicious prosecution; and defendant then-sergeant, now lieutenant Potter had received one prior complaint related to a verbal exchange and not excessive force, false imprisonment or malicious prosecution.

## 2. A Municipality Cannot be Held Liable Pursuant to § 1983 under a Theory of Respondeat Superior

It is well established that a municipality cannot be held liable pursuant to § 1983 under a theory of respondeat superior.  *See Merman v. City of Camden,* 824 F.Supp.2d 581, 589 ("A municipality, however, cannot be held liable under § 1983 for the actions of its agents or employees under a theory of *respondeat superior*.")

To make out a case for municipal liability under 42 U.S.C. § 1983, the Supreme Court has repeatedly held that liability can be found only "where the municipality *itself* causes the constitutional violation at issue."  *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1203, 103

---

[2] It is important to note, as well, that plaintiff cannot prove municipal liability for a failure to discipline in a single specific instance.  Even assuming, *arguendo,* that the defendant officers engaged in unconstitutional conduct which the City thereafter failed to discipline, that alone is insufficient to state a valid claim for municipal liability on a theory of failure to discipline.  *See Santiago*, 891 F.2d at 382 ("we cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*"); *Barker*, 795 F.Supp.2d at 124 ("A single failure to discipline is not sufficient to establish municipal liability under *Monell*.")

L.Ed.2d 412 (1989); *see also Saldivar*, 818 F.3d at 20 (*"Monell* held that although a municipality may not be held liable under a theory of *respondeat superior* for an employee's constitutional violation, it may be held liable when 'execution of [the municipality's] policy or custom . . . inflicts the injury' and is the 'moving force' behind the employee's constitutional violation.")

"*Monell* liability is difficult to establish precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct.  A primary guardrail is the threshold requirement of a plaintiff showing that a municipal policy or custom caused the constitutional injury.  *J.K.J.* 960 F.3d at 377, cert. denied sub nom. *Polk Cnty,* 208 L.Ed.2d 563, 141 S.Ct. 1125 (2021) (citing *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018).

### 3.   Malicious Prosecution Pursuant to § 1983

Count 5 of plaintiff's complaint alleges malicious prosecution against the City pursuant to § 1983.

The First Circuit, adopting a purely constitutional approach to malicious prosecution claims, held in *Hernandez-Cuevas v. Taylor,* 723 F.3d 91, 100–01 (1st Cir. 2013), that a plaintiff may bring a suit under § 1983 (or *Bivens* ) if he can establish that:  "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor."  *Citing Evans,* 703 F.3d at 647.

In addition to those reasons set forth supra regarding municipal liability, a plaintiff would also have to prove an individual of the city is liable for malicious prosecution, as well as the existence of an unconstitutional policy, custom, or practice of violating an individual's constitutional right to be free from malicious prosecution.

A claim for malicious prosecution "does not give rise to a § 1983 claim for relief unless the defendant's actions violated the constitution."  Martin A. Schwartz, Schwartz on Section 1983 Law and Commentary, §8:7.2 8-19, Carol Benedicto, Ed., Practicing Law Institute, 2021.  Because a malicious prosecution claim cannot be asserted against the prosecutor who initiated the criminal prosecution (because of prosecutorial immunity), "the claim, then, would have to be asserted against a law enforcement officer who allegedly played a significant role in bringing about the prosecution."  *Id.*

Similarly, the First Circuit found in *Young* 404 F.3d at 11, "[t]he [district] court correctly interpreted the case law as stating that even without [the individual officers] in the case as defendants, any liability against the city and the supervisory defendants would <u>need to be conditioned on a finding that at least one of the officers violated [the plaintiff's] underlying constitutional right to be free of excessive force</u> during the course of a seizure." (Emphasis added.)  The same rationale is true here when analyzing a claim of malicious prosecution against the City under § 1983.

The plaintiff has not named an individual City employee that "played a significant role in bringing about the prosecution."  The claim of malicious prosecution cannot be brought against the municipality without first finding an individual liable for the same.

### 4.     State law claims of False Arrest, Excessive Force, and Malicious Prosecution

Counts Two (False Arrest under the Rhode Island Constitution), Four (Excessive Force under the Rhode Island Constitution) and Nine (Common Law Malicious Prosecution) each seek to hold the City liable to the plaintiff under Rhode Island Law and Common Law. [3]

Municipal liability under § 1983 cannot be sustained on the basis of respondeat superior, *Merman* 824 F.Supp.2d at 589, nor can the City be liable under a theory of respondeat superior pursuant to the state and common law claims.  In *Cruz v. Town of N. Providence,* 833 A.2d 1237, 1238 (R.I. 2003), the Rhode Island Supreme Court examined the question, "[u]nder the doctrine of *respondeat superior,* is a municipality liable when one of its police officers allegedly assaulted and battered a person arrested for driving a motor vehicle while intoxicated?"  The court ruled that, "[b]ecause the evidence introduced at trial failed to show that the officer's alleged misconduct was the product of a municipal practice or policy, we answer this question in the negative and affirm the judgment in favor of the municipality." *Id.*

Importantly, Cruz's complaint did not allege municipal liability under § 1983.  Instead, the Court concluded that Cruz argued that the municipality was liable under the doctrine of respondeat

---

[3] Counts Six (Common Law Assault), Seven (Common Law Battery), and Eight (Common Law False Arrest) are all directed to the "defendant officers" and does not include the distinction that the rest of the counts contain indicating "against all defendants."  In fact, the City of Providence indicated "no answer required of this defendant" in its answer to plaintiff's complaint on these counts, without objection from the plaintiff. *See* E.C.F. No. 9 at p. 8, ¶¶ 79-81.  Therefore, these counts are not specifically addressed in this section regarding municipal liability.  However, the City posits that plaintiff would not be able to prove municipal liability pursuant to these counts based on the same analysis set forth in this section.

superior for the state law claims of excessive force, assault, and battery.  Cruz's Complaint—filed in Rhode Island Superior Court—alleged "a member of the town's police department physically abused him . . . " and "the assault and battery constituted unwarranted and excessive abuse." *Id.* at 1239. "Significantly, however, Cruz's complaint named only the town as a defendant." *Id.*

The Rhode Island Supreme Court ruled "[a]n employer, such as a municipality, can be held liable for an employee's <u>intentional tort</u> committed against a third party only if the misconduct falls within the scope of employment. *Id. at 1240, citing Drake v. Star Market Co.,* 526 A.2d 517, 519 (R.I. 1987) (*citing Labossiere v. Sousa,* 87 R.I. 450, 143 A.2d 285 (1958); and *Bryce v. Jackson Diners Corp.,* 80 R.I. 327, 96 A.2d 637 (1953)).  "Acts of police brutality, however, whether committed by one or more police officers, do not generally fall within the scope of their employment." *Id.*  The Court went on to say "[n]evertheless, [t]he doctrine of respondeat superior would hold the master liable when the nature of the employee's duty is such that '[his] performance would reasonably put the employer on notice that some force probably may have to be used in executing it.'" *Id.*  In analyzing Cruz's claims, the court noted that "some force" is required when effectuating arrests.  However, plaintiff presented:

> no evidence demonstrated that this conduct was consistent with a municipal practice or policy condoning such behavior. Indeed, there was no indication that the town even knew that this particular officer had any history or assaulting suspects; much less did the evidence show that it encouraged or sanctioned such violent mistreatment of arrestees such as Cruz.

*Id.*  The court ultimately held that the granting of summary judgment in favor of the municipality was warranted and affirmed the Superior Court's granting of the same.

Therefore, the *Cruz* court, analyzing state and common law claims, required a showing of a municipal policy or custom before finding the municipality liable for those state law and common law claims under a theory of respondeat superior.

Finally, because malicious prosecution actions have been disfavored for fear that claims of this type may deter criminal prosecutions, "the plaintiff must establish 'clear proof' of malice and lack of probable cause." *Hill v. Rhode Island State Employees' Ret. Bd.,* 935 A.2d 608, 613 (R.I. 2007); *Soares v. Ann & Hope of Rhode Island, Inc.,* 637 A.2d 339, 345 (R.I.1994) (*citing Solitro v. Moffat,* 523 A.2d 858, 862).  Specifically, plaintiff must show that (1) defendants initiated a prior criminal

proceeding against him, (2) they did not have probable cause to initiate such a proceeding, (3) the proceeding was instituted maliciously, and (4) it terminated in plaintiff's favor. *Hill*, 935 A.2d at 613. In *Soares,* 637 A.2d 339, the court indicated, "malice "may be established by a showing that the person initiating the original action was actuated by a primary motive of ill will or hostility or did not believe that he [or she] would succeed in that action." *Id.* at 345 *citing Nagy v. McBurney,* 120 R.I. 925, 929, 392 A.2d 365, 367 (1978).

### H.    Qualified Immunity

The defense of qualified immunity is also available to the individual defendants named in this case. "Qualified immunity protects public officials who perform discretionary functions both from civil damages or liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated," *Hegarty v. Somerset County*, 53 Fed.3d 1367, 1373 (1st Cir. 1995) (*citing Anderson v. Creighton*, 483 U.S. 635, 638 (1983)).

Conveniently, the 2018 *Wesby* case, *D.C. v. Wesby*, 138 S.Ct. 577 (2018), provides a recent and well-stated summary of the law of qualified immunity. Officers are entitled to qualified immunity unless they have violated a federal statutory or constitutional right, and the unlawfulness of their conduct was clearly established at the time, *Id.* at 589 [12]. Clearly established means that at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful, *Id.* In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate," *Id.* This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law, *Id.*

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means that it is dictated by controlling authority or a robust consensus of cases of persuasive authority, *Id.* at 589-590. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule that the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know, *Id.* at 590 [12]. The clearly established standard also requires that the legal principle clearly prohibits the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Id.* This requires a high degree of specificity, and we have repeatedly stressed that courts must not define

clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he faced, *Id*.  A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established, *Id*.

We have stressed that the specificity of the rule is especially important in the Fourth Amendment context, *Id*.  Probable cause turns on the assessment of probabilities in particular factual context and cannot be reduced to a neat set of legal rules.  It is incapable of precise definition or quantification into percentages, *Id*.  Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered.  Thus, we have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment, *Id*. [13] *citing White v. Pauly*, 137 S.Ct. 548 (2017).  While there does not have to be a "case directly on point," existing precedent must place the lawfulness of a particular arrest beyond debate, *Id*. at 590 [13].  Of course, there can be the rare obvious case where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances, *Id*.  But a body of relevant case law is usually necessary to clearly establish the answer with respect to the principle involved.

Even with respect to the plaintiffs' state law claims, the doctrine of qualified immunity should apply, if necessary.  Even when a state's highest court has not definitively ruled on the precise question at issue, a federal court may predict what the state's highest court would decide if the applicable principles of state law are "sufficiently clear," *see Huegel v. Milberg, et al*, 175 Fed.2d 14, 18 (1st Cir. 1999) (When state law is sufficiently clear to allow federal court to predict its course, certification is both inappropriate and unwarranted.)

While the Rhode Island Supreme Court has not yet expressly adopted the federal doctrine of qualified immunity, it has strongly suggested that it would be so inclined, *see Hatch v. Town of Middletown*, 311 Fed.3d 82 (1st Cir. 2002).  In *Hatch*, the First Circuit noted that there is no decision from the Supreme Court of Rhode Island expressly affording government officials common law immunity from state law claims.  "Nonetheless, Rhode Island's high court has left little doubt that the defense exists for state officers under certain circumstances," *Id*. at 89.  *Hatch* went on to discuss *Pontbriand v. Sundlun*, 699 A.2d 856 (R.I. 1997) and *Ensey v. Culhane*, 727 A.2d 687 (R.I. 1999) as

-23-

two cases where the Rhode Island Supreme Court has strongly suggested that it would be inclined to adopt the doctrine.

The federal doctrine of qualified immunity first was alluded to in *Pontbriand v. Sundlun* where, in recognizing that a public official might be entitled to "some form of common law immunity," the court cited *Harlow* with apparent approval.  699 A.2d 856, 867 (R.I. 1997).  However, *Pontbriand* did not definitively rule on the issue because the case was decided on other grounds.

Later, in *Ensey v. Culhane*, 727 A.2d 687, 690 (R.I. 1999), a suit against the State Police arising out of an allegedly false arrest, the court, again, cited *Harlow* and said that "in an appropriate case, the doctrine of qualified immunity might well be applied by this Court."  *Ensey* also cited, with approval, the following passage from *Hunter*:

> Our cases establish that qualified immunity shields law [enforcement officers] from suit for damages if "a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." [citation omitted].  Even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity.

*Ensey*, 727 A.2d at 691 (*quoting Hunter*, 502 U.S. at 227 (internal citations and quotations omitted)).  However, once more, the court did not rule directly on the qualified immunity question because the case was decided on other grounds.

The First Circuit has described *Pontbriand* and *Ensey* as "reflect[ing] Rhode Island's recognition of a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court in *Harlow v. Fitzgerald*."  *Hatch*, 311 F.3d at 90.  Accordingly, the First Circuit has concluded that applicability of the federal doctrine of qualified immunity to state law claims "is well grounded in the law of Rhode Island," *Id.*

## III.   EVIDENTIARY ISSUES LIKELY TO ARISE

The defendants anticipate certain specific evidentiary issues to arise and have made the same the subject of certain motions in limine identified as follows:

1.   Motion in Limine re:  Prior Complaints of Misconduct/Disciplinary History;

2.   Motion in Limine re:  Underlying Acquittal;

3.      Motion in Limine re:  Cell Phone Calls;

4.      Motion in Limine re:  Use of Statistics; and

5.      Motion in Limine to Exclude all Evidence and/or Reference to any Settlement Agreement that the City has Entered into as Well as the Existence of Pending Suits Against the City and/or the Named Defendant Officers in this Matter.

Aside from those matters, a general issue very likely to arise concerns the plaintiff's police academy experience.  The plaintiff was a member of the same police academy as defendants Place and Sheridan.  Said academy started in May 2014 and ended in October 2014.  However, the plaintiff was dismissed therefrom after approximately six weeks, in June 2014.  He failed on many levels.  His academy file is replete with examples of inappropriate conduct such as insubordination and untruthfulness.  Yet, the plaintiff has suggested in this case that he was treated unfairly and improperly dismissed, and that he was also disliked by defendants Sheridan and Place.

However, this is not an employment discrimination case to determine whether or not the plaintiff was improperly dismissed from the academy.  On the same token, if the plaintiff is going to make suggestions that he was inappropriately dismissed and/or that he was not liked by Place or Sheridan, then the defendants would be entitled to meet such evidence with a full exposure of his academy performance and behavior.  Otherwise, it is likely to confuse the jury as to just what this case is about, and it can also be unfairly prejudicial should anyone on the jury feel that he was improperly dismissed from the academy.  Additionally, the personal feelings of any of the defendants toward the plaintiff are not material or relevant under the objective reasonableness test, which governs § 1983 cases of this type.

Accordingly, this topic is one which should and ought to be addressed prior to the start of evidence.  The defense believes that it should not be a part of this trial but is more than ready to meet the same, evidentiary wise, should the plaintiff open that door.


## IV.   **PROBABLE LENGTH OF TRIAL**

It is anticipated that this trial will/can be completed within four to five trial days.

V.    **WITNESSES AND EXHIBITS**

**Fact Witnesses**

1.    <u>Charm Howie</u>:  Mr. Howie is the plaintiff in this action.

2.    <u>Officer Michael Place</u>:  Officer Place is a named defendant in this action.

3.    <u>Lieutenant Patrick Potter</u>:  Lieutenant Potter is a named defendant in this action.

4.    <u>Officer Matthew Sheridan</u>:  Officer Sheridan is a named defendant in this  action.

5.    <u>Lyllian Willie</u>:  is the plaintiff's ex-wife.  She was present at the home on the evening in question and came out for a portion of the incident taking place in the driveway.  She will also testify to marital problems and financial issues that would rebut allegations of the plaintiff that his arrest led to a breakdown in his marriage and financial difficulties.

6.    <u>Sergeant Paul Zienowicz</u>:  Sergeant Zienowicz is the director of the Office of Professional Responsibility (OPR) for the Providence Police Department and may be called to testify as to municipal liability issues, should the same survive Rule 50.

**Academy Witnesses**

Depending on the outcome of pretrial discussions concerning the plaintiff's police academy attendance, the following witnesses would likely be called to address the same:

7.    <u>Captain James Barros</u>:  Captain (then-Sergeant) Barros was a staff member at the academy with knowledge of the plaintiff's performance therein.

8.    <u>Detective Mitchell Guerra</u>:  Detective Guerra was a staff member at the academy with knowledge of the plaintiff's performance therein.

9.    <u>Captain Luis San Lucas</u>:  Captain (then-Lieutenant) San Lucas was the director of the police academy attended by the plaintiff and has knowledge of his performance therein, and the decision-making process leading to the dismissal of the plaintiff.

10.   <u>Detective Lawrence Werchadlo</u>:  Detective Werchadlo was a staff member at the academy and was the squad advisor for the plaintiff's squad and, as such, has knowledge of the plaintiff's performance at the academy.

**Potential Exhibits**

| Exhibit No. | I.D. | Full | Description of Exhibit |
|---|---|---|---|
| A | | | 10/27/14 – *Keith Howie v. Charm and Lyllian Howie*, complaint for eviction for nonpayment of rent and related judgment and judgment stipulation dated 11/25/14 |
| B | | | 1/20/16 – *Lyllian Howie v. Charm Howie*, complaint for order of protection from domestic violence No. P16-0274A |

-26-

| Exhibit No. | I.D. | Full | Description of Exhibit |
|---|---|---|---|
| C | | | 2/8/16 – Family Court judgment protection from abuse in favor of Lyllian Willie re Case No. P16-0274A |
| D | | | 7/29/16 – Complaint for divorce, *Charm Howie v. Lyllian Willie* Case No. P16-3867 |
| E | | | 4/9/18 – Complaint for divorce *Charm Howie v. Lyllian Willie* Case No. P2018-1849 |
| F | | | 10/22/18 – Final judgment of divorce, *Charm Howie v. Lyllian Willie* Case No. P2018-1849 |
| G | | | 7/10/15 – Past police recruit applicant letter from Pasquale Grenata |
| H 1-5 | | | Academy files:  Weekly observation reports – Werchadlo <br> Week of: <br> 1.  5/5/14 <br> 2.  5/12/14 <br> 3.  5/19/14 <br> 4.  5/26/14 <br> 5.  6/2/14 |
| I 1-6 | | | Academy files:  Disciplinary actions – Charm Howie <br> Week of: <br> 1.  5/12/14 and 5/13/14 – falling asleep in class <br> 2.  5/14/14 – falling asleep in class <br> 3.  5/19/14 – refusal to comply with orders <br> 4.  5/21/14 – lack of respect and team effort <br> 5.  5/21/14 – falling asleep in class and refusal to obey orders <br> 6.  5/22/14 – refusal to follow directions |
| J 1-11 | | | Academy files: <br> Week of: <br> 1.  5/26/14 – Barros/Guerette report to Director San Lucas re inappropriate behavior, failure to respond to training, alienation from classmates, disruptive behavior, and apparent disdain for authority <br> 2.  5/28/14 – report from Director San Lucas to Major Colon for request for dismissal of recruit Charm Howie which stated reasons included failure to comply with commands and refusal to recognize authority <br> 3.  5/29/14 – report from Patrolman Perez to Sergeants Barros and Guerette re careless attitude and lack of effort |

-27-

| | | | |
|---|---|---|---|
| | | | 4. 6/4/14 – report from Director San Lucas to Charm Howie re performance improvement plan<br>5. 6/6/14 – Report from Sergeant Guerette to Director San Lucas re lack of effort<br>6. 6/6/14 – Report from Sergeant Barros to Director San Lucas re inappropriate behavior, poor academic performance, distraction to the academy, and drain on academy resources<br>7. 6/9/14 – report from Werchadlo to Director San Lucas re Howie is failing academically, another recruit has been assigned to assist<br>8. 6/10/14 – report from class leader Guerra re class opinion of recruit Howie<br>9. 6/10/14 – report from Sergeant Guerette to Director San Lucas re request for dismissal re false allegations toward staff members, disrespectful attitude and behavior towards officers and supervisors<br>10. 6/10/14 – report from Director San Lucas to Major Colon re second request for dismissal re continued decline in performance, lack of integrity, insubordination, failure to follow rules and regulations, and lack of respect for authority<br>11. 6/13/14 – termination/dismissal notice |
| K 1-42 | | | Academy files:<br>To/from letters authored by plaintiff addressed to various academy staff members explaining his actions and deficiencies. Forty-two letters covering the period of time between 5/15/14-6/6/14. |
| L | | | Municipal Court complaint and warrant for disorderly conduct |
| M | | | Consent decree, *The Coalition of Black Leadership v. Doorley*, C.A. No. 4523, 349 F.Supp. 127 (D.R.I. 1972) |
| N | | | Discipline logs re PPD officers 2014-2021 |
| O | | | Officer of Professional Responsibility, year-end reports 2013-2018 |
| P | | | Internal Investigations Policy No. 130.01 |

| | | | |
|---|---|---|---|
| Q 1-7 | | | Plaintiff's Social Media Posts:  Anti-Police<br>1.  Eight people killed by Pawtucket pigs<br><br>2.  Support of abolition of Police Department in Minneapolis<br>3.  Racist police officers pull over for DMV violations<br>4.  Brake light – harassment by white police officers<br>5.  200% racism in RI police officers<br>6.  Oppressed kings and queens harassed by racist police<br>7.  People of color treated as N-a when pulled over by police |
| R 1-4 | | | Plaintiff's Social Media Posts:  Anti Government<br>1.  Local politicians are racist<br>2.  Government run by Satan<br>3.  The West governments "keep us chained" |
| S 1-4 | | | Plaintiff's Social Media Posts:  Anti White Bigotry<br>1.  Inferior beings<br>2.  Bush/Clinton, white people – racism<br>3.  Enemy of African Americans<br>4.  Intelligent life form created from another life source<br>5.  Don't borrow from white people |
| T 1-2 | | | Plaintiff's Social Media Posts:  Anti Gay<br>1.  Men dressed as women<br>2.  Locker rooms/gay marriage/abomination of homosexuality |
| U 1-2 | | | Plaintiff's Social Media Posts:  Avoidance of Employment/Work<br>1.  Contracts and undercover racists<br>2.  Job applications – racial component |
| V 1-3 | | | Plaintiff's Social Media Posts:  Marital Discord<br>1.  Evil females<br>2.  Don't need a man BS woman<br>3.  Family Court experience |
| W 1-9 | | | Patrick Potter Awards/Commendations<br>1.  Rhea Archambault 2007 Award, third place<br>2.  Chiefs Award 2011 – murder suspect<br>3.  Rhea Archambault 2011 Award, third place – guns/drugs<br>4.  F.O.P. Award 2012 – guns/drugs<br>5.  Award of Merit 8/11/13 – armed gang member<br>6.  Rhea Archambault 2013 Award, 2nd place – guns/drugs<br>7.  Medal of Valor 3/22/14 – shootout<br>8.  Combat Ribbon 3/22/14 – shootout<br>9.  RI A/G Award 3/22/14 – shootout |

-29-

## VI.    PROPOSED JURY INSTRUCTIONS AND VERDICT FORM

Your defendants have filed a supplement to this pretrial memorandum containing proposed jury instructions and verdict form.  It is anticipated that this form is subject to change post Rule 50 rulings.


DEFENDANT, CITY OF PROVIDENCE,
By its Attorneys,

/s/ Jillian H. Barker
Jillian H. Barker, Esq. #8353
Senior Assistant City Solicitor
/s/ Steven B. Nelson
Steven B. Nelson, Esq. #8142
Senior Assistant City Solicitor
CITY OF PROVIDENCE
444 Westminster Street, Suite 220
Providence, RI  02903
PHONE:  (401) 680-5520
FAX:  (401) 680-5333
EMAIL:  jbarker@providenceri.gov
EMAIL:  snelson@providenceri.gov

DEFENDANTS, PLACE, POTTER
and SHERIDAN,
By their Attorney,

/s/ Michael J. Colucci
Michael J. Colucci, Esq. #3303
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI  02886
PHONE:  (401) 737-3700
FAX:  (401) 737-5499
EMAIL:  mjc@olenn-penza.com


## CERTIFICATION

I hereby certify that I have filed the within with the United States District Court on this 1st day of November 2022, that a copy is available for viewing and downloading via the ECF system, and that I have caused a copy to be sent to:

Shannah Kurland, Esq.
149 Lenox Avenue
Providence, RI  02907

Jillian H. Barker, Esq.
Steven D. Nelson, Esq.
Senior Assistant City Solicitors
City of Providence
444 Westminster Street, Suite 220
Providence, RI  02903

/s/  Michael J. Colucci

-30-